UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/30/20

---

Linda F. Phelps, *as Administratrix of the Estate of
John J. Grimes*,

Plaintiff,

—v—

CBS Corporation f/k/a/ Viacom, Inc., *et al.*,

Defendants.

17-cv-8361 (AJN)

MEMORANDUM
OPINION & ORDER

---

ALISON J. NATHAN, District Judge:

On October 3, 2017, John Grimes and his domestic partner Linda Phelps filed two
lawsuits in New York state court against two different groups of defendants, alleging that Mr.
Grimes developed mesothelioma as a result of exposure to Defendants' asbestos-containing
products while working as a coppersmith apprentice at the Brooklyn Navy Yard.  Presently
before the Court are Defendant Crane Co.'s three *Daubert* motions to exclude or limit expert
testimony and Crane Co.'s motion for summary judgment.  For the following reasons, the Court
grants in part and denies in part the *Daubert* motions and denies the motion for summary
judgment.

## I.    Background

### A.  Factual Background

John Grimes, now deceased, worked at the Brooklyn Navy Yard from October 1961 to
January 1963 as an apprentice coppersmith.  Dkt. No. 142 ("Crane's 56.1 Resp.") ¶¶ 1, 3.
During that time, Grimes worked on a land-based shop and on warships.  *Id.* ¶ 4.  As an
apprentice coppersmith, Grimes worked on copper tubing and pipes, and one of his recurring

1

duties in the coppersmiths' shop at the shipyard was stripping insulation from the exterior of old copper tubing and pipes.  Dkt. No. 132 ("Pl.'s 56.1 Resp.") ¶ 8.  He also worked with master coppersmiths to fabricate new piping or tubing for ships and to repair and refurbish piping and tubing that had been removed.  *Id.* ¶ 9.

In late 2016 and early 2017, Grimes was deposed, and in his deposition he testified as to his experiences that the Brooklyn Navy Yard.  *Id.* ¶ 7.  He testified that he believed he was exposed to asbestos while working in the shop and on warships.  *Id.* ¶ 7.  Grimes did not recall how much of his work at the Brooklyn Navy Yard took place in the shop and how much took place on the warships.  *Id.* ¶ 11.  He also testified that he remembered working on the USS *Constellation*, which was still under construction, among other ships that were docked at the Navy Yard but whose names he could not recall; many of these ships were undergoing rehabilitation.  *Id.* ¶ 7; *see also* Crane Co.'s 56.1 Resp. ¶ 19.  According to Grimes, on the USS *Constellation*, he observed tradesmen working on pumps and valves and working on and in boilers.  Pl.'s 56.1 Resp. ¶ 9.  The parties disagree about the precise understanding of Grimes's testimony with respect to his work on the warships.  Plaintiff avers that Grimes testified that his work on the warships included work in boiler rooms or engine rooms, though he was not sure what the rooms were called.  *Id.* ¶ 9.  Crane Co., meanwhile, characterizes his testimony as representing that Grimes was "guess[ing]" that he worked on boiler rooms or engine rooms.  *Id.* ¶ 9; *see also* Crane Co.'s 56.1 Resp. ¶ 20.  While his job at the Brooklyn Navy Yard involved working with copper tubing and pipe, Grimes did not recall what material flowed through the pipes once they had been installed on the ships.  Pl.'s 56.1 Resp. ¶ 12.  He also could not describe the process by which valves were removed or installed.  *Id.* ¶ 22.

Grimes testified that he worked on the USS *Constellation* "many times," though he refused to provide an exact number and instead noted that it was probably more than ten days. *Id.* ¶ 10; *see also* Dkt. No. 96, Ex. D at 144:4–144:7; 144:20.  The parties disagree about where, exactly, Grimes worked while on the ship.  *See* Crane Co.'s 56.1 Resp. ¶¶ 9, 15.

Grimes also testified that while on board the USS *Constellation*, he saw the name "Crane" in association with some of the bigger valves on the ship, though he could not recall the manufacturers of all of the valves he saw while on the ship, including some of the smaller valves. Pl.'s 56.1 Resp. ¶ 18–19; Crane Co.'s 56.1 Resp. ¶¶ 13–14.  In his deposition, Grimes was asked whether he could recall the frequency with which he saw valves installed on the USS *Constellation*, and he could not recall.  Pl.'s 56.1 Resp. ¶ 21.  Grimes initially testified that he saw Crane valves on warships other than the USS *Constellation*, though he subsequently noted that he "may have" seen Crane valves on other warships; of these, Grimes testified that he may have seen valves that were insulated.  *Id.* ¶ 23; Crane Co.'s 56.1 Resp. ¶¶ 23, 29–31.

In his testimony, Grimes noted that he never personally worked on any valves.  Pl.'s 56.1 Resp. ¶ 15.  He testified that he saw others working on pumps, valves, and catapults in the boiler system, and he further testified that the people he saw working with the valves may have been pipefitters. *Id.* ¶ 17; Crane Co.'s 56.1 Resp. ¶ 10–11.  Grimes testified that he observed gaskets put on the face of the valves during installation and that he observed gaskets when valves were disconnected or removed, though he could not recall the gaskets' color or texture, what the gaskets' packaging looked like, or who supplied the gaskets to the ship.  Crane Co.'s 56.1 Resp. ¶ 12; Pl.'s 56.1 Resp. ¶ 25.  The parties disagree as to parts of Grimes's testimony regarding whether he could see the inside of the valves; Crane Co. argues that Grimes never testified that he "encountered or was around others working on internal valve components," while Plaintiff

argues that the fact that Grimes testified he could see inside the valves means that he was around internal valve components.  Pl.'s 56.1 Resp. ¶ 29; *see also* Crane Co.'s 56.1 Resp. ¶ 24.  Grimes also testified that some of the valves he saw being removed from insulated pipelines were partially insulated with external insulation materials.  Pl.'s 56.1 Resp. ¶ 27.  The parties agree that Grimes specifically recalled having observed valves being removed from a boiler.  Crane Co.'s 56.1 Resp. ¶ 27.

In his testimony, Grimes remarked that when he worked on the warships, "dust came from everywhere."  Pl.'s 56.1 Resp. ¶ 30; *see also* Crane Co.'s 56.1 Resp. ¶¶ 16–17, 32–34.  The parties disagree about whether Grimes's testimony addressed the source of the dust and the extent to which installation and removal of the valves affected the conditions.  Crane Co.'s 56.1 Resp. ¶¶ 33–34.  Nonetheless, the Brooklyn Navy Yard and the U.S. Navy neither provided him with any breathing protection nor warned him about asbestos-related hazards.  Pl.'s 56.1 Resp. ¶ 31.  The conditions aboard the ship were such, according to Grimes, that "[s]ometimes when [he] went home at night and [he] would spit out it was like black, black – blackish gook."  Crane Co.'s 56.1 Resp. ¶ 18.  According to Grimes, when he was working at the Navy Yard, he did not know whether any gaskets that were used with valves around which he worked contained asbestos.  Pl.'s 56.1 Resp. ¶ 26.

### B.  Procedural Background

Grimes and his domestic partner, Linda Phelps, commenced this action against Crane Co. and other Defendants in the Supreme Court of New York, County of New York, on October 3, 2017.  Pl.'s 56.1 Resp. ¶ 1; *see also* Dkt. No. 1, Ex. A.  This is one of two parallel actions that Grimes filed in New York state court.  *Id.* ¶ 2.  Both actions relate to his alleged exposure to asbestos and his subsequent development of mesothelioma.  *Id.*  On October 30, 2017, Defendant

Foster Wheeler LLC removed Plaintiff's state court action under 28 U.S.C. ¶ 1442.  *See* Dkt. No.

1.  Crane Co. then filed a Notice of Joinder of Removal on November 17, 2017, Dkt. No. 6,

which the Court denied on June 21, 2018, Dkt. No. 29.  Grimes died in December 2017, *see* Dkt.

No. 48-1, leaving Plaintiff Linda Phelps, as administratrix of Grimes's estate, as the sole plaintiff

in this action.  On March 19, 2019, Plaintiff amended the Complaint.  Dkt. No. 56.  Crane Co.

answered on April 2, 2019, Dkt. No. 59, bringing cross-claims against the other defendants.

Expert discovery closed on December 6, 2019, *see* Dkt. No. 78.  On March 18, 2020, Plaintiff

notified the Court that her Naval Engineering Expert, Captain William Lowell, died, Dkt. No.

112, and on March 31, 2020, she substituted Captain Bruce Woodruff as her new naval expert,

*see* Dkt. Nos. 116, 118.

Crane Co. has moved for summary judgment.  Dkt. No. 95.  And at the same time it filed

three *Daubert* motions to exclude the testimony of Plaintiff's expert witnesses Gary Crakes, Dkt.

No. 99, Dr. David Zhang, Dkt. No. 102, and Steven Paskal, Dkt. No. 105.  The motions are fully

briefed. *See* Dkt. Nos. 120, 122, 130, 134, 135, 137, 139, 141.

## II.    Legal Standards

### A.    Expert Testimony

Federal Rule of Evidence 702 governs the admissibility of expert testimony.  That rule

states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or
> education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of
> > fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), district courts analyzing the admissibility of expert testimony under this rule have a "gatekeeper function." *Restivo v. Hessemann*, 846 F.3d 547, 575 (2d Cir. 2017). Specifically, courts have "an obligation to determine whether the expert's specialized knowledge will assist the trier of fact, *i.e.*, will be not only relevant, but reliable." *United States v. Romano*, 794 F.3d 317, 330 (2d Cir. 2015). The court should "focus on the principles and methodology employed by the expert" and exclude the expert's testimony if those principles and methodology are unreliable. *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 662 (2d Cir. 2016) (citation omitted).

Although it establishes a "gatekeeper" function for expert testimony, the *Daubert* test is nonetheless "a liberal" and "permissive" standard of admissibility. *Nimely v. City of New York*, 414 F.3d 381, 395–96 (2d Cir. 2005). Expert testimony should be excluded only "if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." *Restivo*, 846 F.3d at 577 (quoting *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009)). Absent this degree of unreliability, any "other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Id.* (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)).

**B.     Summary Judgment**

Federal Rule of Civil Procedure 56 authorizes a court to grant summary judgment to a moving party "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "material" if it "might affect the outcome of the suit under the governing law," and it is "genuinely in dispute" if "the evidence is

such that a reasonable jury could return a verdict for the nonmoving party." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d.Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  When deciding a motion for summary judgment, the Court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223 (2d Cir. 1994).  The moving party has the initial burden of demonstrating that no genuine issue of material fact exists.  *Id.*  If the moving party satisfies this burden, then "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact" to survive summary judgment.  *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citation omitted).

## III.    Discussion

Crane Co. has moved to exclude under Rule 702 certain testimony of three of the Plaintiff's expert witnesses: Dr. Gary Crakes, who has made projections about Grimes's lost earnings; Mr. Steven Paskal, an industrial hygienist who will testify about Grimes's potential asbestos exposure at the Brooklyn Navy Yard; and Dr. David Zhang, who seeks to provide testimony linking Mr. Grimes's asbestos exposure to his mesothelioma.  For the following reasons, Crane Co.'s motions are granted in part and denied in part.

### A.    Dr. Crakes's Testimony Concerning Projections of Grimes's Lost Earnings is Excluded in Part

Crane Co. urges the Court to exclude speculative testimony of the Plaintiff's expert Dr. Gary Crakes, who would speak to Grimes's lost earnings, and require that any testimony by Dr. Crakes be based on the "totality of Mr. Grimes' income history and the other evidence in this case."  Dkt. No. 101 ("Crane Co.'s Mem. Supp. Mot. to Exclude Crakes's Test.") at 7.  Crane Co. argues that Dr. Crakes's six alternative estimates as to Grimes's lost future earnings are speculative and unsupported by the record, *id.* at 2; that the first two benchmark earnings figures

are unrepresentative snapshots based on an incomplete record of Grimes's earnings history, while the third benchmark figure lacks sufficient factual foundation because it does not fit the facts of the instant case, *id.* at 4–6; with respect to the two work-life estimates, that the numbers provided were selected by Plaintiff's counsel without consideration of Crane Co.'s pre-diagnosis health, *id.* at 3–4; and that the fringe benefits and household services estimates used by Dr. Crakes—based on nationwide averages—are not based on facts in the record, *id.* at 6–7.

### 1.      Testimony Based on Two of the Three Benchmark Figures is Excluded

The Second Circuit has held that "[w]here lost future earnings are at issue, an expert's testimony should be excluded as speculative if it is based on unrealistic assumptions regarding the plaintiff's future employment prospects." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996). The *Boucher* Court found that an expert's projections as to the plaintiff's lost earnings, which assumed full-time employment prospects, lacked sufficient factual foundation considering the plaintiff's checkered employment history, including sporadic and seasonal employment. *Id.* at 22. Because nothing in the record had indicated that the plaintiff's current employment would no longer be seasonal or that his employment prospects had undergone a "fundamental change," the expert's testimony of the projections was based on unrealistic and speculative assumptions and had been improperly admitted. *Id.*

While the problematic projections in *Boucher* concerned a plaintiff's prospects for permanent, full-time work, *Boucher*'s holding that an expert may not rely upon unrealistic and speculative assumptions also applies to projections concerning the *amount* of lost earnings in the instant case. In fact, *Boucher* cited to a Third Circuit case, *Gumbs v. Int'l Harvester, Inc.*, which found that expert testimony regarding lost earnings had been improperly admitted where the expert based his projections on an annual income more than twice the average annual income of

the plaintiff for four years prior to the accident in question.  *Gumbs*, 718 F.2d 88, 98 (3d Cir.

1983).

In this case, two of the benchmark projections relied upon by Dr. Crakes—Grimes's 2014

income and the median income from 2019 for attorneys in New York state—are unrealistic and

speculative.  As noted by Crane Co., Grimes's 2014 earnings of $100,616 were an outlier, more

than double the amount of any other year between 2013 to 2016.  Crane Co.'s Mem. Supp. Mot.

to Exclude Crakes's Test. at 4.  Moreover, the Plaintiff provides no explanation as to why the

2014 figure was used as opposed to a figure closer in time, such as from 2015 or 2016.

As for the median earnings of $146,000 for attorneys in New York state, the data is so

broad and wide-reaching—without narrowing to Grimes's work location (Westchester County),

area of practice (family law), or volume of cases—as to constitute an "apples and oranges

comparison."  *See Restivo*, 846 F.3d at 577; *see also Imbierowicz v. A.O. Fox Memorial Hosp.*,

841 N.Y.S.2d 168, 173 (2007).  Additionally, Grimes never earned this median yearly amount or

a greater amount in his working life.  Dkt. No. 100, Ex. B, Crakes Dep., at 20:19–20:24.  As

such, expert testimony of lost earnings based on the above two benchmarks may not be

submitted to the jury.  *See Boucher*, 73 F.3d at 22 (expert testimony lacking factual foundation

was inadmissible); *Gumbs*, 718 F.2d at 98 (same).

However, the remaining benchmark, Grimes's median income from 2014 to 2016, is not

based on unrealistic or speculative assumptions about Grimes's income.  This figure reflects

Grimes's *actual* earnings from the years immediately prior to his death.  *See, e.g.*, *Mono v. Peter

Pan Bus Lines, Inc.*, 13 F. Supp. 2d 471, 478 (S.D.N.Y. 1998) (under New York law, the starting

point for calculating lost earnings is Grimes's gross income at the time of death).  Dr. Crakes

was given Grimes's earnings information from the years 2013 to 2016, and he chose to exclude

the 2013 earnings (which would have significantly reduced the average), stating, "[I]f someone earns nothing in a particular year, one would not assume that their earning capacity is zero." Dkt. No. 100, Ex. B, Crakes Dep., at 43:4–43:19.  He also did not obtain publicly available Social Security Administration records, which show that Grimes's average earnings from 1998-2015 were much less than the average presented from 2014 to 2016.  Crane Co.'s Mem. Supp. Mot. to Exclude Crakes's Test. at 5.  But the average provided is grounded in Grimes's *actual earnings preceding his death*.  As such, Crane Co.'s arguments as to Grimes's earnings in other years speak to the weight of the testimony and are fodder for cross-examination.  *Restivo,* 846 F.3d at 577.

Thus, Crane Co.'s motion to exclude testimony based on the 2014 income and the median income from 2019 for attorneys in New York State benchmark projections is granted, while its motion to exclude testimony based on Grimes's median income from 2014 to 2016 is denied.

### 2.      Testimony Based on Cited Work Expectancy Figures is Admissible

The two work-life expectancy figures used by Dr. Crakes, five years and nine years, were relayed to Dr. Crakes by the Plaintiff's counsel.  These figures are based on testimony by Grimes in November 2017 that he had not made plans to retire and on testimony by Plaintiff (Grimes's domestic partner) that Grimes did not have retirement plans prior to his death and had planned to work another five to ten years.  Dkt. No. 119, Ex. B, Grimes Dep., at 284:23–285:9; Dkt. No. 119, Ex. F, Phelps Dep., at 31:12–31:15; *see generally* Dkt. No. 100, Ex. B, Crakes Dep., at 16:11–16:14.  Dr. Crakes also listed a life expectancy for Grimes, who died at the age of 77.98 years, of an additional 9.11 years using statistics for the National Vital Statistics Reports published by the U.S. Department of Health and Human Services, thus providing further support that the work-life expectancy figures are not speculative.  Dkt. 119, Ex. E, Crakes Dep., at

14:17–14:25; *see, e.g.*, *Earl v. Bouchard Transp. Co.*, 735 F. Supp. 1167, 1175 (E.D.N.Y. 1990) ("Statistical charts, such as mortality tables and work-life expectancy tables . . . are often deemed authoritative . . . ."), *aff'd in part, rev'd in part on other grounds*, 917 F.2d 1320 (2d Cir. 1990); *House v. Kent Worldwide Machine Works, Inc.*, 359 F. App'x 206, 209 (2d Cir. 2010) (finding life expectancy tables from the National Vital Statistics Reports reliable).

As such, the figures are grounded in a sufficient factual foundation, and testimony based on these figures is admissible. Any "contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Restivo*, 846 F.3d at 577 (quoting *Boucher*, 73 F.3d at 21 (work-life expectancy testimony properly admitted when a proper foundation was laid and figures were based on widely accepted work-life tables)). Accordingly, the Court sees no basis to exclude this testimony.

### 3.    Testimony with Respect to Cited Lost Fringe Benefits is Excluded, While Testimony with Respect to Lost Household Services is Admissible

Dr. Crakes's calculations with respect to fringe benefits and household services are based on data published by U.S. Department of Labor's Bureau of Labor Statistics. Neither calculation is based on evidence that Grimes actually received fringe benefits or performed household work. Dkt. No. 100, Ex. B., Deposition of Dr. Crakes, at 23:9–23:22, 39:16–40:15.

The *Boucher* Court found that where there was no evidence that the plaintiff received fringe benefits of any kind, expert testimony projecting fringe benefits had been improperly admitted. *Boucher*, 73 F.3d at 22; *see also Joffe v. King & Spalding LLP*, No. 17-CV-3392 (VEC), 2019 WL 4673554, at *8 (S.D.N.Y. Sept. 24, 2019) (opinion as to fringe benefits inadmissible when using an average of all employer contributions tracked by Bureau of Labor Statistics, rather than an average specific to law firm partners or even New York attorneys).

Here, Dr. Crakes's calculations of fringe benefits—based on "average benefit payments in the United States"—were not based on any reliable, factually grounded assumptions specific to Grimes, nor does the Plaintiff argue that the expert testimony would be based on anything other than national averages.  Dkt. No. 120.  Thus, testimony with respect to the cited fringe benefits must be excluded.

Dr. Crakes's calculation of household services is based on a national average for males without children in the household, without accounting for the age of the male.  Dkt. No. 119, Ex. E, Crakes Dep., at 22:1–22:15, 23:22–23:24.  However, courts have noted that the value of lost household services is inexact, and testimony based on national averages has been deemed admissible to calculate such losses under the liberal standards of Rule 702 when there are no serious flaws in use of the data, even when the data is not "tailored especially well to the facts" of the case.  *See Hersko v. United States*, No. 13-CV-3255 (JLC), 2016 WL 6126461 at *10–*11 (S.D.N.Y. Oct. 20, 2016) (citing *In re Fosamax Prod. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009)).  Crane Co. has not alleged any serious flaws in using national averages, such as that Grimes performed no household services prior to his death or that he would have ceased performing household services had he not been diagnosed with mesothelioma.  *See id*.  As such, Dr. Crakes's testimony with respect to lost household services is admissible.

Finally, Crane Co. requested a *Daubert* hearing in the event the Court did not accept its position.  *See* Crane Co.'s Mem. Supp. Mot. to Exclude Crakes's Test. at 7.  District courts are not required to hold a formal *Daubert* hearing in advance of qualifying an expert witness. *United States v. Williams*, 506 F.3d 151, 161 (2007).  Because the Court has found a sufficient basis in the papers for allowing testimony related to Dr. Crakes's use of Grimes's median salary from 2014 to 2016 as a benchmark figure, his use of work-life expectancy figures of five and

nine years, and his calculation of lost household services, the request for a *Daubert* hearing is denied as unnecessary. *Id*.

**B.     The Motion to Exclude Mr. Paskal's Expert Testimony is Denied**

Crane Co. also moves to exclude the testimony of the Plaintiff's industrial hygienist expert, Mr. Steven Paskal, who opines in his report on the potential ranges of asbestos exposure experienced by Grimes. Dkt. No. 107 ("Crane Co.'s Memo. Supp. Mot. to Exclude Paskal's Test.") at 1.

Mr. Paskal formed the opinion that based on Grimes's experience of sharing enclosed airspaces with workers engaged in removing gaskets and stems/shafts—which Mr. Paskal stated were "virtually always" comprised of asbestos during the relevant time period—from valves and other equipment, Grimes's asbestos exposures at the Brooklyn Navy Yard spanned from .1-10 fibers/cc. Dkt. No. 121-7, Report of Steven Paskal, at 4 ¶ 5. He also opined that based on Grimes's close proximity to and shared enclosed airspaces with workers engaged in removing and installing thermal system insulation—which Mr. Paskal stated were "virtually always" comprised of asbestos during the relevant time period—Grimes's cumulative exposures to asbestos at the Brooklyn Navy Yard spanned from "1-10 fibers/cc, with excursions higher during dustier phases." *Id.* Overall, Mr. Paskal wrote that "Mr. Grimes would have incurred asbestos exposures that ranged from hundreds to millions of times greater than (and in addition to) ambient pollution levels in even the most polluted areas. Each of these exposures substantially increased his risk of contracting mesothelial cancer." *Id.* at 4–5 ¶ 7.

Crane Co. argues that Mr. Paskal admitted that Grimes's actual exposure depends on the work practices involved, but that Mr. Paskal does not have sufficient information about the work practices at issue. Crane Co.'s Mem. Supp. Mot. to Exclude Paskal's Test. at 2–3, 6. According

to Crane Co., Grimes, in his testimony, was only able to guess at the circumstances under which workers removed gaskets and was unable to describe the work he saw in detail, *id.* at 3–4, and the Plaintiff's Naval Expert would only provide testimony as to "common" (not actual) work practices at the Brooklyn Navy Yard.  Dkt. No. 137 at 6.  Crane Co. thus contends Mr. Paskal's opinions are speculative and would be highly prejudicial.  Crane Co.'s Mem. Supp. Mot. to Exclude Paskal's Test. at 6.

Plaintiff counters that Crane Co. mischaracterizes Mr. Paskal's statement that specific work practices are necessary to determine exposure ranges.  Dkt. No. 122 at 15.  Rather, the Plaintiff argues that the ranges were based on Grimes's exposure to the manipulation of gaskets and insulation, which are facts grounded in testimony provided by Grimes and the Plaintiff's Naval Expert (who would testify about relevant work practices of the Navy, including the use of asbestos-containing materials during the time period in question), as well as based on Mr. Paskal's own experience and knowledge that gaskets used by the Navy during the relevant time period almost always contained asbestos.  *Id.* at 14, 15.  Specifically, Grimes testified to working in close proximity to workers installing and removing insulation and gaskets from valves—including valves embossed with the name "Crane"—during his time working in the engineering and boiler spaces on ships in the Brooklyn Navy Yard.  *Id.* at 2.  He further testified that the air in the rooms when he saw work being performed on valves was visibly dusty.  *Id.* at 6.  For these reasons, the Plaintiff contends that Mr. Paskal's testimony will not be speculative.  *Id.* at 15–16.

First, it is true that Mr. Paskal stated that actual work practices would affect the level of actual asbestos exposure experienced by Grimes.  *See, e.g.*, Dkt. No. 106, Ex. A, Paskal Dep. at 32:20–32:24 ("For gasket work in relation to valves or anything else, the range from .1 or 10 or 10 plus, actually, applies, and the needle goes up and down based on the aggressiveness of the

work practices.").  However, while actual work practices are relevant to determining actual

exposure, this should not be conflated with Mr. Paskal's assertions that the ranges he provided *in*

*fact apply* in the circumstances noted by Mr. Paskal (and circumstances which the Plaintiff

contends Grimes experienced), irrespective of the "aggressiveness" of actual work practices.  *See*

*id.* at 32–35.  These are circumstances in which residue has prevented the easy removal of

asbestos-containing materials such as gaskets, thus requiring manipulation—such as scraping or

cutting—of the materials without controls (such as "wetting" or "glove bagging"); the exposed

person in these circumstances would be in an enclosed airspace in proximity to the work being

performed.  *See id.* (stating, *inter alia*, that "It's where there's residue that has to be dealt with

where you have the exposure range that I identify there.").  For instance, asked to determine an

exposure range when he did not have information about the work being performed on a gasket,

Mr. Paskal stated, "If there's residue and it's removed without controls, obviously, you could

have .1, you could have 10, depending on the work practices that were used to remove that

residue." *Id.* at 34:6–35:3.  Thus, the range provided would be applicable, though the actual

level of exposure within the range would vary.

As noted, the ranges provided by Mr. Paskal are based on several factual assumptions.

At trial, if a hypothetical question is posed to an expert based on assumed facts, the facts

assumed must "be substantially based on facts established in previous testimony adduced at

trial." *Redman v. Maritime Overseas Corp.*, No. 94-CV-0838 (SAS), 1996 WL 19010, at *2

(S.D.N.Y. Jan. 17, 1996); *see also Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267

(2d Cir. 2002) (expert conclusions must be based on "good grounds").  If expert testimony is

otherwise admissible, then critiques that there are "gaps or inconsistencies" in the reasoning

underlying the expert's conclusions speak to the weight of the evidence, not its admissibility.

*See, e.g., Campbell ex rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001).

Here, Plaintiff has asserted that "[a]t trial, Mr. Paskal will be asked to assume facts based on Mr. Grimes' testimony and other evidence that will be presented to the jury during the course of trial, including the opinions of Plaintiff's Naval Expert who may testify regarding the work practices that were common on Naval ships and in shipyards during this time period." Dkt. No. 122 at 15–16. Because Plaintiff may offer evidence to establish facts upon which Mr. Paskal relies, including video testimony from Grimes and general testimony from the Plaintiff's Naval Expert, Mr. Paskal's opinions cannot be excluded at this stage. *Amorgianos*, 303 F.3d at 267.

Crane Co. contends that Grimes's testimony is insufficient to provide such a factual basis because Grimes could only "guess" as to the circumstances surrounding gasket removal and could not specifically describe the process of valve removal. Crane Co.'s Mem. Supp. Mot. to Exclude Paskal's Test. at 3–4. Both of these contentions are unpersuasive. As to the first contention, Crane Co. quotes the following testimony from Grimes:

> Q: How do you believe that you were exposed to asbestos from the removal of these valves on the warships?
>
> A: As I mentioned, the valves when — I believe when installed, it was not metal on metal, it was a gasket, and so when the valves were removed, there was a gasket and, **this is only my guess**, after years of being fastened, you know, it just doesn't come off and there's like sticking on one – either on the boiler or on the valve or both.

*Id.* at 4 (quoting Dkt. No. 106, Ex. E, Grimes Dep., at 208:4–208:13). The portion of the testimony that Crane Co. emphasized, however, could reasonably be interpreted to mean that Grimes was *guessing* that the reason the gaskets did not come off easily was due to having been fastened for years, not that he was guessing as to whether they were "sticking" and not easily removed. Additionally, the fact that Grimes, who worked as an assistant coppersmith, could not specifically describe the process of gasket removal does not necessarily indicate that his

testimony does not relate the work he observed (including work on Crane valves) and provide other information constituting a factual basis for Mr. Paskal's opinion. These are matters for the fact finder to resolve.

Crane Co. analogizes Mr. Paskal's opinions to those of experts in *Amorgianos* and *Nook v. Long Island R. Co.* In *Amorgianos*, the Second Circuit held that the testimony of an expert industrial hygienist was properly rejected because the expert failed to apply his own methodology reliably. *Amorgianos*, 303 F.3d at 268–69. As explained, while actual asbestos exposure depends on actual work practices, Mr. Paskal's provided ranges are not speculative because they are based on Grimes's proximity to removal and installation work involving gasket and other residue. Mr. Paskal relies on assumptions that may be established by other evidence at trial, and any perceived gaps and inconsistencies in his reasoning are subject to cross-examination. *Campbell*, 239 F.3d at 186.

This case is also unlike *Nook*, in which the court rejected the expert testimony of an industrial hygienist based on a report by the expert stating that Grimes had been exposed to high silica dust levels. The expert's opinions were speculative because the expert, despite having tested certain cement material for silica, could not "purport to explain how the quantity of silica in the cement affected the quantity of silica in the air," and his opinions were not "based on testing or objective data regarding the actual conditions under which Grimes allegedly worked." *Nook v. Long Island R. Co.*, 190 F. Supp. 2d 639, 642 (S.D.N.Y. 2002). The court further noted that the report did not offer "data, testing methodology or empirical evidence" and did not "cite any published authority in support of its recommendations and conclusions." *Id.* In contrast, it is anticipated that Mr. Paskal's opinions will be based on testimony by both Grimes and the

Plaintiff's Naval Expert.  Additionally, Mr. Paskal relies on peer-reviewed scientific literature in opining on exposure levels.

For these reasons, Crane Co.'s motion to exclude Mr. Paskal's testimony is denied.  And because the Court has found a sufficient basis in the papers for allowing Mr. Paskal's testimony, Crane Co.'s request for a *Daubert* hearing is denied.  *See Williams*, 506 F.3d at 161.

### C.    The Motion to Limit Dr. Zhang's Specific Causation Testimony is Denied.

Crane Co. also moves to limit the testimony of Plaintiff's medical expert, Dr. David Zhang, on the issue of specific causation, and specifically on whether Crane Co.'s products were a substantial factor in causing Grimes's mesothelioma.  Dkt. No. 102.  To prevail on her theory of liability, Plaintiff must establish both general and specific causation.  *See Parker v. Mobil Oil Corp.*, 857 N.E. 2d 1114, 1120–21 (N.Y. 2006).  Crane Co. does not challenge Dr. Zhang's findings as to general causation, in which he links Grimes's asbestos exposure to malignant mesothelioma.  Nor does Crane Co. meaningfully challenge Dr. Zhang's assertion that Grimes's exposure to asbestos-containing products from his time working at the Brooklyn Navy Yard caused his mesothelioma.  But Crane Co. raises two arguments regarding whether Dr. Zhang's testimony as to specific causation should be precluded.  *First*, Crane Co. argues that Dr. Zhang should not be permitted to offer any specific causation testimony because he did not perform a Crane Co.-specific analysis and because his expert reports did not specifically disclose opinions related to Crane Co.'s products.  Dkt. No. 104 ("Crane Co.'s Mem. Supp. Mot. to Exclude Zhang's Test.") at 4.  *Second*, Crane Co. argues that Dr. Zhang's methodology is unreliable because it hinges on an "every exposure" theory—that is, that every exposure Grimes had to asbestos-containing material was a "substantial factor" in causing his disease.  *Id.* at 4–5.  For the reasons that follow, Crane Co.'s motion is denied.

*First*, Crane Co. argues that because Dr. Zhang's reports do not address Grimes's exposure as to Crane Co.'s products, Dr. Zhang should be precluded from "offering any undisclosed causation testimony related to Crane Co. at the time of trial." *Id.* at 4. In arguing as much, Crane Co. asserts that because "Dr. Zhang did not consider the circumstances of any of Mr. Grimes' alleged exposures from any particular defendant's products," Dr. Zhang's expert testimony would lack a proper foundation. *Id.* Thus, Crane Co. challenges Dr. Zhang's ability to testify as to specific causation on the basis that any specific causation testimony would lack the proper foundation under the principles espoused in Rule 702, and especially Rule 702(d), of the Federal Rules of Evidence.

The Court is unpersuaded. Plaintiff intends to have Dr. Zhang testify in response to hypothetical questions based on facts established elsewhere at trial.[1] *See* Dkt. No. 130 ("Pl.'s Mem. Supp. Opp. to Mot. to Exclude Zhang's Test.") at 18–19. It is commonplace to have expert witnesses testify to his or her opinion "based on a set of assumed facts"—facts elicited

---

[1] In responding to Crane Co.'s motion to preclude, Plaintiff cites to a new affidavit from Dr. Zhang that more directly provides a specific causation opinion about Defendant Crane Co. *Id.* at 13–15. Crane Co. challenges the admissibility of this affidavit under Rule 26. *See* Dkt. No. 139 at 2. With respect to untimely expert affidavits submitted in conjunction with dispositive motions, such affidavits may be considered by the court if "within the scope of the initial expert report." *Advanced Analytics, Inc. v. Citigroup Glob. Mkts, Inc.*, 301 F.R.D. 31, 36 (S.D.N.Y. 2014). However, "courts will not admit supplemental expert evidence following the close of discovery when it expound[s] a wholly new and complex approach designed to fill a significant and logical gap in the first report, as doing so would eviscerate the purpose of the expert disclosure rules." *Id.* (internal quotation marks and citations omitted). Because the parties have not briefed this issue, and Plaintiff has not had an opportunity to respond to Crane Co.'s argument regarding the admissibility of the affidavit, the Court requires further briefing from both parties before ruling on the affidavit's admissibility. For purposes of this motion, though, the Court has not considered the affidavit. Furthermore, to the extent Crane Co. contends that Dr. Zhang's testimony should be barred because he did not previously disclose those opinions, *see* Crane Co.'s Mem. Supp. Mot. to Exclude Zhang's Test. at 4–5, that argument is not properly raised in their *Daubert* motion; Crane Co. may raise this argument directly through pre-trial *in limine* motions or at trial, as appropriate.

elsewhere in the record.  *Goetz v. Hershman*, No. 06-CV-8180 (RPP), 2010 WL 2813497, at *14

(S.D.N.Y. July 15, 2010), *vacated in part on other grounds*, 423 F. App'x 3 (2d Cir. 2011); *see

also Cunningham v. Gans,* 507 F.2d 496, 500–01 (2d Cir. 1974).  And here, there are facts from

which Dr. Zhang may provide his opinion as to specific causation related to Crane Co.  This

includes Mr. Paskal's scientific quantification of Grimes's asbestos exposure levels, Grimes's

testimony regarding his observation of work performed on Crane Co. valves, and the naval

expert's testimony regarding the presence of Crane Co. valves on the USS Constellation, among

other ships, and the kinds of work that Grimes would have been exposed to.  To the extent Crane

Co. disputes these facts, it may attack the factual accuracy of the assumed facts on which Dr.

Zhang's testimony would be premised.  And, during cross-examination, Crane Co. may also ask

Dr. Zhang if his opinion would change if other facts were assumed.  *See Goetz*, 2010 WL

2813497, at *14.  But, at bottom, Crane Co.'s challenge to this testimony goes to the weight of

the evidence rather than its admissibility.  *See Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18,

21 (2d Cir. 1996) ("[O]ther contentions that the assumptions are unfounded go to the weight, not

the admissibility, of the testimony." (internal quotation marks omitted)); *see also Amorgianos*,

303 F.3d at 267 ("Vigorous cross-examination, presentation of contrary evidence, and careful

instruction on the burden of proof are the traditional and appropriate means of attacking shaky

but admissible evidence." (alteration omitted) (quoting *Daubert*, 509 U.S. at 596)).

This case parallels *Krik v. Crane Co.*, 76 F. Supp. 3d 747 (N.D. Ill. 2014), where Crane

Co. similarly argued that "because Dr. Frank and Parker offered no specific testimony during

their depositions or in their initial expert reports tying Krik's exposure to Mobil's facility, they

should be precluded from testifying as to Mobil at all."  *Id.* at 755.  The district court rejected

this argument, agreeing with the plaintiff that "these arguments go to the weight of the evidence

and are appropriate for cross-examination, but are not grounds for exclusion under Rule 702." *Id.* at 755–56. Same here. Accordingly, to the extent that Plaintiff will present facts at trial that Grimes was exposed to asbestos by Crane Co. products and to the extent that Dr. Zhang will rely on those facts at trial, he will be permitted to testify regarding that exposure. *See id.* at 756; *see also Osterhout v. Crane Co.*, No. 5:14-CV-208 (MAD) (DEP), 2016 WL 10950439, at *23 (N.D.N.Y. Mar. 21, 2016) ("It is entirely consistent with the Federal Rules for Dr. Markowitz to rely upon a hypothetical at trial which asks him to assume what the evidence demonstrates: that Crane Co. manufactured some of the asbestos-containing valves used in the fireroom where Mr. Osterhout served, particularly since Crane Co. is aware of, and has questioned Dr. Markowitz about his opinions about Mr. Osterhout's exposure to asbestos from valves.").

*Second*, in its motion to preclude Dr. Zhang's testimony, Crane Co. separately argues that Dr. Zhang's testimony should be precluded because his reports posit an "every exposure" theory—that every exposure Grimes had to asbestos-containing material was a "substantial factor" in causing his disease. Crane Co.'s Mem. Supp. Mot. to Exclude Zhang's Test. at 5–6. The "every exposure" theory, according to Crane Co., has been deemed unreliable by other courts, and Crane Co. contends that, if allowed, it would enable Plaintiff to simply allege exposure to asbestos from Crane Co.'s products without any evidence of the actual level of exposure from Defendant's products or its significance. *Id.* at 5–6. Plaintiff counters that Crane Co. mischaracterizes Dr. Zhang's theory, and that, rather than positing that each and every asbestos exposure causes disease, Dr. Zhang asserts that there is no known safe level of asbestos exposure while stating that a *cumulative* exposure to asbestos is a substantial contributing factor

to mesothelioma.[2]  Pl.'s Mem. Supp. Opp. to Mot. to Exclude Zhang's Test. at 20–21.  From there, she argues that Dr. Zhang's opinion testimony would be based on the facts of the case as well as his expertise and knowledge.  *Id.* at 21.  And Plaintiff contends that Dr. Zhang's "cumulative exposure" theory is permissible.

Courts are split on whether the "every exposure" theory and the "cumulative exposure" theory are the same.  *See Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 677 (7th Cir. 2017) (noting that under both "it is impossible to determine which particular exposure to carcinogens, if any, caused an illness," and emphasizing that courts around the country have rejected the cumulative exposure theory); *Berman v. Mobil Shipping & Transportation Co.*, No. 14-CV-10025 (GBD), 2019 WL 1510941, at *11 (S.D.N.Y. Mar. 27, 2019) (collecting cases distinguishing between the two theories and finding the cumulative exposure theory permissible).  As Judge Cote recently noted, however, the cumulative exposure theory is not a "rewording" of the "every exposure" theory, focusing on the determination that "any exposure above background . . . *increases [a] person's risk* of developing mesothelioma" rather than finding that any exposure "above background *causes* mesothelioma, no matter the type or the dose."  *Relyea v. Borg Warner Corp.*, No. 12-CV-3564 (DLC), 2015 WL 5567034, at *2 n.2 (S.D.N.Y. Sept. 22, 2015) (emphasis in original); *see also Berman*, 2019 WL 1510941, at *11; *Osterhout v. Crane Co.*, No. 14 Civ. 208 (MAD) (DEP), 2016 WL 10950439, at *23 (N.D.N.Y. Mar. 21, 2016); *In re Asbestos Prods. Liab. Litig.*, No. 10 Civ. 61118 (DRS), 2011 WL 605801, at *4 (E.D. Pa. Feb. 16, 2011)

---

[2] Dr. Zhang has set out in his reports, citing the NIOSH, OSHA and various epidemiological studies, that there is no known safe level of asbestos exposure above background and that even low or short-duration exposure can cause injury or disease; higher accumulative exposure can lead to higher risks of developing mesothelioma and lung cancer.  Dkt. No. 103, Ex. B, Report of Dr. Zhang at 8–12; Dkt. No. 129, Ex. A, Deposition of Dr. Zhang, at 30:19–31:9, 52:13–52:24.

(permitting testimony that "each exposure contributed to [plaintiff's] cumulative dose of asbestos exposure, which determines his overall risk of developing an asbestos-related disease").

As was the case with the expert witness in *Relyea*, Dr. Zhang's written report expounds on the Helsinki Criteria as the relevant factors for considering whether exposure to asbestos has caused mesothelioma in a particular case, and Dr. Zhang applies that analysis to Grimes's case. *See Relyea*, 2015 WL 5567034, at *2; *see also* Dkt. No. 103, Ex. B, Report of Dr. Zhang, at 12–17. And Dr. Zhang reviewed Mr. Parkal's report regarding Mr. Grimes's exposure level to asbestos in formulating his expert opinion. Dkt. No. 103, Ex. B, Report of Dr. Zhang, at 16. *See Relyea*, 2015 WL 5567034, at *2 ("In addition, to apply the Helsinki Criteria to the facts of this case, Ohar states that she relies upon specific estimates of the magnitude of Relyea's brake dust exposure provided by Paskal as well as scientific literature specifically linking brake dust to asbestos."). In this regard, and with due consideration of the *Daubert* standard for admissibility, the Court concludes that Dr. Zhang's application of the "cumulative exposure" theory in this case evinces a sufficiently reliable methodology to satisfy the *Daubert* threshold for admissibility. Crane Co. may challenge on cross-examination Dr. Zhang's application of that methodology, but those challenges go to the weight of his testimony and not its admissibility. *See Relyea*, 2015 WL 5567034, at *2.

For the reasons set forth above, Crane Co.'s motion is denied. Crane Co.'s request for a *Daubert* hearing is denied as unnecessary.

**D.**     **Crane Co.'s Motion for Summary Judgment is Denied**

Crane Co. also moves for summary judgment.  It bases its motion on three arguments, all of which focus on the legal element of specific causation.[3]  *See* Dkt. No. 98 ("Crane Co.'s Mem. Supp. Summ. J. Mot.") at 4.  First, Crane Co. argues that Plaintiff's expert witnesses have not presented any evidence that Crane Co. conduct or products caused Grimes's mesothelioma.  *Id.* at 5–8.  This argument relies especially on Crane Co.'s assertion that Dr. Zhang and Mr. Paskal did not testify to having causation opinions specific to Crane Co., and its corollary assertion that the absence of a defendant-specific analysis entitles it to summary judgment as a matter of law. *Id.*; *see also* Fed. R. Civ. P. 56(a).  Second, Crane Co. argues that there is no evidence that any flange gaskets or insulation that the Navy used with any Crane Co. valve at issue contained asbestos, and, relatedly, that Plaintiff has not provided evidence that Grimes was exposed to asbestos as a result of work performed by others on Crane Co. valves because both asbestos-containing and non-asbestos-containing varieties of products were used at the time period in question.  *Id.* at 8–10.  Finally, Crane Co. argues that there is no evidence of any asbestos exposure from a Crane Co. valve, and that Plaintiff has failed to support the argument that asbestos exposure resulted from the work others performed on Crane Co. valves in Grimes's presence.  *Id.* at 10–13.

Crane Co. first argues that it is entitled to summary judgment as a matter of law on the question of specific causation, noting that the record does not and cannot support what Plaintiff must show at trial to establish that Crane Co.'s products caused Grimes's mesothelioma.  *Id.* at

---

[3] While, in its motion for summary judgment, Crane Co.'s Mem. Supp. Summ. J. Mot. at 5 n.2, Crane Co. notes that there is still ambiguity regarding choice of law, the parties' moving papers rely overwhelmingly on New York law, as evinced by Crane Co.'s reliance on *Juni*. Where the parties' briefs assume that New York law controls, such "implied consent" is sufficient to establish choice of law. *See Nat'l Utility Serv., Inc. v. Tiffany & Co.,* No. 07-CV-3345 (RJS), 2009 WL 755292, at *6 n.6 (S.D.N.Y. Mar. 20, 2009).  The Court assumes, for purposes of this opinion, that New York law applies.

5–8.   As an initial matter, Crane Co. is correct that expert testimony is required to establish

specific medical causation, as that analysis is beyond the jury's ken.  *Id.* at 5–6; *see, e.g.*, *In re*

*Mirena IUS Levonorgestral-Related Prods. Liab. Litig. No. II*, 387 F. Supp. 3d 323, 341

(S.D.N.Y. 2019) ("It is well established that 'expert testimony is required to establish causation'

where the issue of causation is 'beyond the knowledge of lay juror.'" (citing *Wills v. Amerada*

*Hess Corp.*, 379 F.3d 32, 46 (2d Cir. 2004))).  And Crane Co. argues that because none of

Plaintiff's experts provided expert testimony in their expert reports as to Crane Co.'s products,

there is no basis on which Plaintiff can establish specific causation.  *See* Crane Co.'s Mem. Supp.

Summ. J. Mot. at 5–8.

In support of its argument, Crane Co. points to the specific causation standard articulated

in *In re New York City Asbestos Litigation* ("*Juni*"), noting that the case requires "defendant-

specific scientific analysis of the element of causation."  *Id.* at 6–7.  In *Juni*, the court found

expert testimony to be insufficient to prove specific causation where the plaintiff's medical

expert testified "only in terms of an increased risk and association between asbestos and

mesothelioma" but failed to quantify or otherwise provide any scientific expression of the

plaintiff's asbestos exposure level (if any) from Crane Co.'s products.  *Juni*, 148 A.D.3d 233,

237–239 (1st Dep't 2017), *aff'd*, 116 N.E.3d 75 (N.Y. 2018) (finding insufficient evidence of

proximate causation).  As a result, the court could not accept a judgment in favor of the plaintiff

based on the "bare conclusion that because the plaintiffs worked with Crane Co.'s asbestos-

containing products, those products were a contributing cause of the plaintiff's mesothelioma."

*Id.* at 238.

As already noted, however, Plaintiff intends to have Dr. Zhang testify in the form of a

hypothetical question to the issue of specific causation.  *See* Dkt. No. 130 at 18.  And the Court

has already concluded that Dr. Zhang will not be precluded from doing so, insofar as Crane Co.'s

challenges go to the weight, rather than the admissibility of the testimony.  The question, then, is

whether there are facts in the record to support Plaintiff's contention that the issue of specific

causation is genuinely in dispute.  As noted below, Grimes's testimony and Plaintiff's naval

expert's testimony both provide a sufficient basis from which Dr. Zhang may testify, in the form

of a hypothetical question, as to the issue of specific causation.  Crane Co. may, of course,

challenge his testimony.  But after drawing all reasonable inferences in Plaintiff's favor, and in

light of Plaintiff's showing that there are facts genuinely in dispute as to whether Crane Co.'s

valves contributed to Grimes's mesothelioma and Plaintiff's averment that Dr. Zhang's

testimony at trial will present an opinion as to specific causation, the Court concludes that there

is a genuine issue of material fact sufficient to preclude summary judgment on this point.

Second, Crane Co.'s argument that it is entitled to summary judgment on the basis that

there is no evidence that Crane Co.'s products on the relevant ships may have contained asbestos

is unavailing.  Crane Co. argues, for instance, that "[n]either Mr. Grimes nor any other witness in

this matter provided evidence that any such insulation that 'may' have been used on a Crane Co.

valve in Mr. Grimes' presence contained asbestos," and that "Plaintiff's Navy expert, Captain

William Lowell, confirmed in his deposition that the Navy used both asbestos-containing and

non-asbestos-containing insulation materials."  Crane Co.'s Mem. Supp. Summ. J. Mot. at 9.

From there, it argues that "it is entirely speculative to conclude that the insulation that others

allegedly worked with in connection with valves in Mr. Grimes' presence contained asbestos."

*Id.*  But at their core, Crane Co.'s arguments go to the *weight* of Plaintiff's evidence.  As Plaintiff

notes in her opposition to Crane Co.'s summary judgment motion, Mr. Paskal testified, based on

his experience, that BNY insulating materials "virtually always" comprised of asbestos during

the relevant time period.  Dkt. No. 134 at 12; *see also* Dkt. No. 121-7, Report of Steven Paskal, at 4 ¶ 5.  In addition, Plaintiff supports her argument by pointing to the anticipated testimony of her naval expert, which will be based on ship records, drawings, and specifications regarding the use of asbestos-containing insulation.  *See* Dkt. No. 133, Ex. 39, Amended Expert Report of Captain William A. Lowell, at 14.  Because the Court disagrees that there is "no evidence" to support Plaintiff's position—and because the Court is compelled to draw reasonable inferences in Plaintiff's favor—Crane Co.'s argument that summary judgment is proper on this basis is unpersuasive.

Along similar lines, there is a genuine issue of material fact as to whether Grimes was exposed to asbestos from a Crane Co. valve based on the work done by others.  The first challenge that Crane Co. offers relates to whether there is sufficient evidence in the record to create a genuine issue of material fact as to whether, and to what extent, Grimes was exposed to asbestos as a result of his work on the USS Constellation, among other ships.  Crane Co.'s argument relies primarily on the claim that Grimes's testimony as to the frequency, regularity, or proximity of any exposure is too vague to survive summary judgment.  *See* Crane Co.'s Mem. Supp. Summ. J. Mot. at 12–13.  Yet with respect to frequency, regularity, and proximity, the record reflects that Plaintiff has marshalled Grimes's testimonial evidence, in conjunction with her experts' testimony, to create genuine issues of material fact as to each of those.

Crane Co. argues, for instance, that Grimes did not testify as to proximity regarding any work done on valves and as to whether any valve-related work was the source of the asbestos dust he encountered.  *See* Dkt. No. 141 at 7–8.  At least at this juncture, however, Grimes's testimony can fairly be read as informing the question of proximity, addressing, as it did, his testimony that he saw pipefitters installing and removing valves and working on gaskets in those

valves. *See* Dkt. No. 133, Ex. 1, Grimes Dep., at 153:19–153:24, 155:10–156:14, 157:9– 158:1; 156:1–156:3; 158:2–158:80.  In addition, Plaintiff points to Captain Lowell's report as corroborating Grimes's testimony that his work as an apprentice coppersmith would have placed him in close proximity to workers installing pumps, valves, boilers, and insulation. *See* Dkt. No. 134 at 6–7; *see also* Dkt. No. 133, Ex. 38, Supplemental Report of Captain William A. Lowell at 3–4; Dkt. No. 133, Ex. 39, Amended Expert Report of Captain William A. Lowell at 10, 13–14. Moreover, while the parties dispute the proper interpretation of Grimes's testimony regarding the frequency with which Grimes was exposed to asbestos while on his ship, Grimes's deposition testimony, in conjunction with the naval expert's testimony, compels a reasonable inference that the exposure was relatively regular. *See* Pl.'s 56.1 Resp. ¶ 18; *see also* Dkt. No. 133, Ex. 1, Grimes Dep., at 144:4–144:7, 144:12–144:15.  Furthermore, Crane Co.'s argument that no genuine issue of material fact exists as to the source of asbestos dust Grimes encountered is unpersuasive.  As Plaintiff indicates in her opposition to Crane Co.'s 56.1 statement, Grimes's testimony as to the source of asbestos dust is, at best, subject to varying interpretations.  Grimes testified that "dust came from everywhere."  Dkt. No. 96, Ex. D, Grimes Dep., at 369:25–370:14. But in context, the fact finder may determine that Grimes, who was responding to a question that specifically mentioned work being done on Crane Co. valves, was confirming that Crane Co. products were a source of the asbestos dust, even if Grimes could not identify a specific *object*. *See* Pl.'s 56.1 Resp. ¶ 30.  Furthermore, Plaintiff also emphasizes Mr. Paskal's testimony as supporting the claim that Grimes's work while in boiler rooms and engine rooms, at the same time as other personnel was engaged in the removal and replacement of gaskets associated with valves, would cause asbestos exposures spanning the orders 0.1-10 fibers/cc.  Dkt. No. 121-7, Report of Steven Paskal, at 4 ¶ 5.  Grimes's testimonial evidence and Plaintiffs' experts'

testimony thus raise a genuine issue of material fact as to whether Grimes was exposed to asbestos due to his work in boiler rooms and engine rooms while on these ships.

But that is only one part of Crane Co.'s challenge.  Crane Co. also avers that, even if that were the case, there is no evidence to support the notion that Grimes was exposed to asbestos from *Crane Co.* valves on these ships.  Here too, though, in drawing all reasonable inferences in Plaintiff's favor, the Court concludes that a genuine issue of material fact exists.  Grimes testified that he saw at least some valves that said "Crane" while aboard the USS Constellation. Pl.'s 56.1 Resp. ¶ 18.  And in his expert report, Captain Lowell cited to ship records that showed the presence of Crane Co.'s valves that indicated that there were Crane Co. valves aboard the USS Constellation.  Dkt. No. 133, Ex. 39, Amended Expert Report of Captain William A. Lowell, at 13–14.  That assertion was further bolstered by Captain Lowell's expert testimony regarding the history and prevalence of Crane Co. valves on ships during this time period.  *Id.* at 11–14.  Here, too, drawing inferences in Plaintiff's favor, the Court concludes that there is sufficient evidence in the record as to create a genuine issue of material fact.

Crane Co. further argues that even if Plaintiff could place Crane Co. valves in the engine and boiler rooms, there is no evidence that the "Navy used asbestos-containing (as opposed to non-asbestos-containing) flange gaskets or insulation with any Crane Co. valve that others worked on in Mr. Grimes' presence."  Crane Co.'s Mem. Supp. Summ. J. Mot. at 11–12.  Here, as well, the expert testimony on which Plaintiff intends to rely suffices to create a genuine issue of material fact.  Plaintiff points to Captain Lowell's report, in addition to Captain Woodruff's anticipated testimony, as relying on drawings and specifications in which Crane Co. and Chapman (which is owned by Crane Co.) specified the use of asbestos-containing insulation. *See, e.g.*, Dkt. No. 133, Ex. 38, Supplemental Report of Captain William A. Lowell, at 3–4.  And

Plaintiff also intends to rely on Mr. Paskal's expert opinion that during this period, the insulating materials in question were "virtually always" comprised of asbestos during the relevant time period.  Dkt. No. 121-7, Report of Steven Paskal, at 4 ¶ 5.  While it is not an objective certainty that Crane Co.'s valves on these ships contained asbestos, a reasonable jury could conclude, based on the documentary evidence and the expert testimony, that they did.

In light of the aforementioned, and after drawing all reasonable inferences in Plaintiff's favor, the Court concludes that Plaintiff's experts' testimony, Grimes's testimony, and the relevant ship records collectively raise a genuine issue of material fact as to whether exposure to asbestos from Crane Co.'s products was a substantial factor in causing Grimes's mesothelioma. *See Berman v. Mobil Shipping & Transportation Co.*, No. 14-CV-10025 (GBD), 2019 WL 1510941, at *7–8 (S.D.N.Y. Mar. 27, 2019) (denying summary judgment in an asbestos case on the basis that testimonial, documentary, and expert evidence sufficed to create a genuine issue of material fact as to causation).  Summary judgment is denied.

## IV.     Conclusion

For the reasons stated above, the Crane Co.'s *Daubert* motions are granted in part and denied in part.  Crane Co.'s motion for summary judgment is denied.  This resolves Dkt. Nos. 95, 99, 102, and 105.  There is currently in place a briefing schedule on Defendant Foster Wheeler's summary judgment motion.  *See* Dkt. No 172.  This Order does not alter any of those pending deadlines.

SO ORDERED.

Dated:  November 30, 2020
        New York, New York

_____
ALISON J. NATHAN
United States District Judge